## DORCHESTER *v.* YOUNGMAN.

A citizen's pecuniary interest in a question of town affairs does not disqualify him from voting upon it.

ASSUMPSIT. This is one of seven suits at law, brought by the plaintiffs, to recover money alleged to have been wrongfully paid. The defendant produced an agreement in writing, properly entitled, and signed by himself and one Norris, as agent of the plaintiffs, in which it was agreed that the suit having been settled, should be entered " neither party ;" and the defendant moved that the agreement be filed by the clerk, and the action so entered. Counsel employed by Norris moved for leave to appear for the plaintiffs, and take charge of the suit. These motions were resisted by Kinsley, a prior agent of the plaintiffs, who claimed that he had not been legally dismissed as agent, and that Norris had not been legally elected. Kinsley was dismissed, and Norris was elected at the annual town-meeting in November, 1880. The vote dismissing Kinsley and electing Norris was passed by the votes of the seven defendants, against whom the suits were brought, and could not have been passed without them. Kinsley claims that their interest was such as to disqualify them from voting.

*C. R. Morrison,* for the town as represented by Kinsley, agent. But for the votes of the defendants in the bill in equity, every motion would have been carried by the party with whom Mr. Kinsley acted ; and even counting the votes of the selectmen, every motion and balloting would have been in their favor but for the votes of the *seven* defendants in the suits at law. These suits were brought to recover town's money and state bonds, which those defendants illegally and fraudulently put in their own pockets and kept from the knowledge of the town for about ten years, the most of them being in office during that time, and some of them holding the custody of the books and papers of the town. Five of the seven defendants were town officers, either selectmen, town clerk, town treasurer, or town auditors, and the charge is of conspiracy by all.

Among the maxims which have come down to us from our ancestors are these : No man shall be a judge in his own cause, nor vote upon a bill in which he has a direct pecuniary interest personal to himself and not merely in common with his fellows. In respect to the former, Lord Coke declared that "even an Act of Parliament made against natural equity, as to make a man a judge in his own cause is void in itself." Co. Lit., s. 212. And in respect to the latter maxim, the speaker of the House of Commons, in 1811, told the members of the house that "if they opened their journals they would find it established two hundred years ago, and then spoken of as an ancient practice, that a personal interest in a question disqualified a member from voting." Cush., 9th ed., s. 1844.

Judge Cooley says, that " a legislative act which should undertake to make a judge the arbiter of his own controversies would be void, because, though in form a provision for the exercise of judicial power, in substance it would be the creation of an arbitrary and irresponsible authority, neither legislative, executive, nor judicial, and wholly unknown to constitutional government." And he also says that "It is not left to the discretion of a judge, or to his sense of decency, to decide whether he shall act or not; all his powers are subject to this absolute limitation; and when his own rights are in question, he has no authority to determine the cause." Cool. Con. Lim. 175, 411. And so it is a maxim, that one cannot unite the opposite characters of buyer and seller, either on his own account or that of another, or as an officer of the law. 21 N. H. 70, 88, 89. And so a selectman cannot act in behalf of the town in making a loan to himself, or in ratifying such a loan. 51 N. H. 350; 44 N. H. 418. In short, nowhere among civilized nations can one be permitted to act on both sides, or represent both sides, in matters in which he has a pecuniary interest.

We have no statute which attempts to create such a monstrosity. For although a moderator may perhaps not reject the vote of any one whose name is on the check-list, even for a disqualifying interest, yet the fact that a vote is received does not make it legal. One may be prosecuted criminally for voting, where the moderator may not be warranted in rejecting his vote; and illegal votes are always to be rejected by the body to whom the return is to be made, or ultimately by the court. A legal voter, whose name is upon the check-list, may vote in all matters in which he has not a direct personal and opposing pecuniary interest; but this does not give him the right to exercise an authority "wholly unknown to constitutional government." A town, in addition to its political privileges, has rights of property, as to which the town and its inhabitants are subject to the rules which are applicable to private corporations in the matter now under consideration. Dill. Mun. Cor. 245, *ss.* 217, 279; *Coles* v. *Williamsburgh*, 10 Wend. 659; *Buell* v. *Buckingham*, 16 Iowa 284; Cool. Con. Lim. 237; Gr. Bri. 570.

If, then, the defendants in the suits could not determine what disposition should be made of them by the plaintiffs, what follows? The 7th article was indefinitely postponed by a majority of five or eight, as the votes of the selectmen are allowed or disallowed, and was not again before the meeting. It is immaterial that the votes of these persons had not been challenged at that town-meeting. It was well understood that their right to vote was disputed, for their having voted upon similar questions was one of the grounds of complaint in the bill in equity. And by parliamentary law "no time is limited" for the disallowance of votes for direct pecuniary interest; and "if in consequence of the allowance or disallowance of votes the majority is thereby changed and the decision of the

house reversed, all the subsequent proceedings become null and void." Cush. Parl. Law, *ss.* 1827, 1849.

The same result would follow if the 7th article were to be regarded as still before the meeting, if the town should choose to act upon it by a majority of the legal votes; the motion to remove the town agent was lost if the selectmen could not act, and they could not. The rule is, that parties named in the bill, either individually or collectively, are excluded from voting, whatever their interest may be, and members not named in the bill are excluded, provided they have a "direct pecuniary interest." Cush. Parl. Law, *s.* 1846. Tried by either test, the selectmen were disqualified. At that meeting there was no formal challenge No challenge was necessary; but if necessary it could not be necessary to renew it at each successive step. *Moses* v. *Julian,* 45 N. H. 54.

The result is, then, that from that point forward there was a majority of legal votes against the Norris party, and the majority being changed, the subsequent proceedings became " null and void."

*Burleigh & Adams,* for the town as represented by Norris, agent. If John A. Norris was legally chosen agent of the town, the agreement with the defendant was binding, and the suits should have been entered neither party. There are only two grounds upon which his election can be held invalid,—first, because the articles in the warrant were not acted upon in the order written therein, and when article seven was partially acted upon other business intervened before it was completed; and, second, because seven citizens voted for the dismissal of the old agent, Nathan B. Kinsley, and the election of a new agent to manage suits for the town in which they were defendants.

I. As to the first, *s.* 3, *c.* 39, Gen. Laws, defining the duties of moderator, is a sufficient answer. The law does not prescribe any order in which the business of town-meetings shall be taken up, nor the rules of procedure which shall govern the moderator. See *Hill* v. *Goodwin,* 56 N. H. 441. The selectmen of towns cannot bind him to a fixed order of business by the numbering of articles inserted in the warrant. The articles in a warrant show simply what topics of business can be legally acted upon *(s.* 2, *c.* 38, Gen. Laws), but the order, time, and manner in which they are to be severally taken up and acted upon are wisely left to the presiding officer of the meeting. Article 7 of the warrant was plainly broad enough to render valid the dismissal of the old agent, the election of a new one, and the resolution passed, empowering him to settle the suits in question, had all this been done when the article was first under consideration.

It does not matter that other business was done between the appointment of the agent, and the instructions of the town as to his duties. During the continuance of a meeting, it is never certain that votes relative to the prudential business of the town may not be materially changed or entirely rescinded, and the fact that citi-

zens ignorant of the law and parliamentary practice go home before the close of the meeting, on the supposition that the town will do nothing adverse to their wishes, cannot bar those who remain and attend to business from the exercise of their statutory rights. Any other interpretation of the law would enable the indolent, ignorant, or captious few to reverse the results of every town-meeting, and reduce the solemn acts of the town to perfect chaos, and elections to the merest farce.

II. As to the defendant's right to vote on the dismissal of Kinsley and the election of Norris, we refer to part I, art. 11, of our bill of rights, where the following language is used: "All elections ought to be free, and every inhabitant of the state, having the proper qualifications, has equal right to elect and be elected into office." "No part of a man's property shall be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people." *Id.*, art. 12. The qualifications of voters referred to in the bill of rights are fixed and defined in *ss.* 1 and 9 of *c.* 29, Gen. Laws.

The duty of a moderator to receive, sort, and count the votes of all persons whose names appear upon the check-list, is made peremptory by *c.* 31, Gen. Laws, and the penalty of disobedience is made severe and certain by *s.* 9, *c.* 36, of the same laws, and cases there cited. Section 8 of the same chapter reiterates the disqualifications of persons to vote, and imposes fine or imprisonment for fraudulent voting. We have found no authority for the novel legal position taken by Kinsley's counsel respecting the qualifications of voters, either in the cases cited by the plaintiffs from our state reports, or from any other New Hampshire reports by us examined. This is a constitutional question which our own bill of rights has clearly settled in the articles hereinbefore cited, and by art. 12, part I, of same bill, the latter part of which reads as follows: "Nor are the inhabitants of this state controllable by any other laws than those to which they or their representative body have given their consent."

The qualifications for voting are the same when applied to the prudential affairs of the town as to political questions and candidates. The rules which determine the right of a citizen to vote are few, simple, and of easy application, and none of them contemplate the relationship of the voter to subjects to be acted upon at the meeting, or his interest in measures which are of local importance as a test of his right. All persons who can vote at all are absolutely equal in their rights at town-meetings, regardless of their special interest in certain measures. Even if it were known that men had an interest in, and for that reason it was unlawful for them to vote upon, a certain article, there is no power lodged anywhere to reject their votes. The men who are to act as judges of these matters are seldom learned in subtleties of the law, and frequently have limited experience in town business, and to require

of them investigations into a multitude of questions relative to voting qualifications, and subject the town to the expense, vexation, and uncertainty incident to an examination into the private affairs of every voter in town, or person who claimed to be a voter, would practically defeat the end of municipal government itself. This question of a voter's right is broader and lies deeper than town elections, their prudential affairs, and the election of their municipal agents. There is a principle which applies to all forms of government, and is observed by them in the exercise of governmental power, which should govern this case. There is a unit of political force of sovereignty in every government, from which all authority springs, and upon which the fabric of government and society rests. In republics, democracies, and all forms of government where political suffrage exists as the basis of power to any extent, the individual voter of the class that exercises suffrage is that unit. Our republican form of government has enlarged the basis of sovereignty by increasing the number of political units, or, in other words, by lowering and lessening the qualifications of voters, and thereby extending suffrage. These political units, or voters, are in all respects and for all purposes absolutely equal, as much so as the units in a mathematical problem. And when the antecedent tests for suffrage are complied with, and a man becomes a voter, his voice and vote cannot be suppressed upon any question that is acted upon at a legal meeting, so long as he remains qualified according to the standard applied to all other voters. The collective will of the voting class, ascertained through the votes of these political units, creates and changes constitutions, legislatures, and every other agency belonging to successful government. They are the primary and sustaining source of all law. No legal voter can exclude another equally qualified. Each is entitled to express his own individual opinion; and the opinion of a numerical majority present and voting upon a given question must prevail. Voters at town-meetings exercise no special trust: they are their own sovereigns. In the elemental exercise of political power, it is impossible that all voters should be reduced to a dead level of pecuniary or any other interest in questions acted upon at political and business meetings. No human society is made up in such a way. In the best of political systems there will be some friction and some injustice, but the object of all beneficent government is to reduce these evils to the minimum. The fact that our government is republican in form presupposes a civilized and enlightened people, with sufficient moral and intellectual force to be trusted at the polls. If we are not fit for self-government, the remedy is in limiting political power to the hands of the gifted few; but as at present organized we see no lawful escape from a free ballot and a fair count.

When men act in legislative bodies, or as the agents of other parties, they occupy fiduciary positions; and direct pecuniary and

personal interests in matters committed to their keeping properly disqualify them from acting judicially in those cases. In the trial and settlement of all private claims, also, no man is permitted to sit in judgment when personally interested; for all judicial tribunals are organized to act with the strictest impartiality. These are elementary principles, well·considered and long settled. But voters at the polls sustain no such relations, and cannot violate any such trusts. The authorities cited by Kinsley's counsel do not afford any light, therefore, in deciding upon the legal status of John A. Norris as the newly elected agent of the town.

*A. P. Carpenter*, for the defendant. I. Courts universally favor and encourage a settlement of lawsuits by the parties. Honest lawyers do likewise. It is better in general that each party should yield somewhat of his supposed rights in order to effect a compromise of contested claims, rather than that both parties be impoverished by long and expensive litigation.

II. The principal question for the consideration of the court is, whether these seven defendants could lawfully vote upon the questions which arose in the meeting under article 7. The objection is, that they could not legally vote because they are personally and directly interested in the subject-matter. This objection, we submit, is without foundation. Suppose, in the first place, that there were but one suit and one defendant, and that the question is upon his right to vote.

1. The question is not one of propriety, of delicacy, of good taste, nor even of good morals, but of strict legal right. See *Allen* v. *Bruce*, 12 N. H. 418–424.

2. The maxim, that no one can be judge in his own cause, has no application. If it had, it would prevent all the citizens of a town from voting upon any matter respecting the conduct of town affairs. Not only would it prevent any one from voting for himself for any office of honor or profit, but his sons, or his wife's brothers, uncles, cousins, &c., to the fourth degree of relationship, could not vote for him. It might happen that in some towns and in many school-districts no officers could be elected, and they would be condemned to anarchy. Happily that maxim, by its very terms, applies only to judicial proceedings. *Moses* v. *Julian*, 45 N. H. 52, and cases cited.

3. Even in legislative bodies a member is entitled to vote upon questions wherein he is directly interested, unless there be a subsisting rule to the contrary. Hence rule 17 (Rules of 1870) of the house in this state, and the similar rule of congress. The very fact of the adoption of the rule is conclusive of the right to vote in the absence of such a rule.

Accordingly, in the impeachment of Andrew Johnson, though the right of the president of the senate to be sworn as a member of the court of impeachment was at first questioned, the objection

was withdrawn, and he finally voted in favor of impeachment without objection from any quarter, notwithstanding the fact that if the prosecution had prevailed it would have made him president of the United States with a salary of $25,000 a year. Impeachment of A. Johnson, vol. 2, 487—vol. 3, 360–401.

John P. Stockton voted upon the question of his own right to a seat in the senate, and would thereby have retained his seat but for the subsequent action of that body, by which it was determined that his vote should not be received, upon the ground not merely that he was directly interested, but that it was a judicial question. Cong. Globe, 1st sess. 39th Cong., 1602, 1635–1648, and see especially the remarks of Sumner, Trumbull, and Sherman.

In the course of the debate (see *p.* 1647), Senator Sherman avowed that upon a certain occasion, when a member of the state legislature, after full and deliberate consideration, he came to the conclusion that it was not only his right but his duty to vote for himself for some high office, which he does not name. No sound distinction can be drawn between an office of honor and profit, and a claim for money or discharge from pecuniary liability, so far as this question is concerned.

In *Phillips* v. *Eyre*, L. R. 4 Q. B. 225, it was held that the governor of a colony could legally give his official assent to a legislative measure in which he was personally interested. The measure in that case was an act of indemnity, providing among other things that no action should be maintained against the governor (defendant in the case) for any acts by him done in suppressing a rebellion, and confirming and making lawful all such acts. *Cockburn*, C. J., there says (*p.* 235–6), "There is no authority for saying that a man who has legislative power may not legislate on his own behalf."

4 But the town in this case was neither a judicial nor a legislative body. It had no power either to determine the defendant's legal rights, or to make any law or to establish any rule in respect to the case. It did not undertake to do either, but as a municipal body lawfully assembled it was acting merely upon a question of policy—a question relating solely to the conduct and management of its own business affairs—over which it had exclusive jurisdiction. By its action the town determined to settle the suits if possible rather than subject the town to the great expense necessary in order to investigate and enforce them, and also to the risk of much greater expense in case of defeat. In other words, its action was neither judicial nor legislative, but prudential only. *Denniston* v. *School Dist.*, 17 N. H. 497.

If one may, in a legislative body, vote in his own interest *a fortiori*, may he do so in a municipal meeting?

No good reason can be assigned why he should not vote, inasmuch as his interest in the question plainly differs in degree only, and not in kind, from that of every other member of the corpora-

tion. By the action taken he may gain or lose more than any other member; but it is easy to conceive of cases in which his pecuniary interest and that of another single tax-payer would be substantially the same. Suppose, for example, that in any town A pays five tenths and B four tenths of all the taxes, and that the town claims of A $100: plainly A's pecuniary interest in the matter is just $50, and B's just $40.

In all cases where the pecuniary interest of a town is involved, the degree of the interest of its citizens must necessarily differ very largely, that of each being theoretically in exact proportion to the amount of taxes he pays. But the law does not in any case (except a class of cases not here material, 45 N. H. 55, and 5 Mass. 90) regard the magnitude or degree of interest, but the kind or quality only. 1 Greenl. Evid., *s.* 391; *Ins. Co.* v. *Price,* 1 Hopk. Ch., *c.* 1; *Northampton* v. *Smith,* 11 Met. 395.

A town has frequent occasion to act upon matters in which individuals, in addition to their general interest as citizens, are also specially interested, wherein their interest may properly be said to differ in kind as well as degree from that of all the other citizens of the town,—as, for example, the discontinuance of a highway (G. L., *c.* 71, *s.* 1), especially one laid out for the accommodation of an individual (*c.* 67, *s.* 14); establishing a public library, cemetery, or park (*c.* 37, *s.* 4); erecting and maintaining a reservoir of water to be used in case of fire (*c.* 37, *s.* 7); division of the literary fund among school-districts (*c.* 94, *s.* 7). In all these matters it is manifest that some of the inhabitants may have, combined with their general public interest, a strong personal and pecuniary interest, but it cannot seriously be questioned that they have nevertheless a legal right to vote thereon. Between these examples and the case before the court, there is, it is submitted, no legal distinction.

Among all the cases of contested elections within my reach, I find no one where an election was even claimed to be invalid for the reason that the person appearing to be elected voted for himself, though the practice of so voting in respect to all offices is not unfrequent, and, in respect to many, such as state, county, etc., is universal. See the remarks of Senator Sherman, before referred to. Marcus Morton was elected governor of Massachusetts in 1839 by one majority, and undoubtedly voted for himself; yet it never occurred, apparently, to any of his astute opponents to object to his election upon that ground.

The fact that the practice has been so constant and so well understood, and continued for so long a time without being questioned even by partisan zeal, is conclusive that it is proper and lawful; and if one may legally vote for himself for offices of honor and emolument, it is impossible to assign any sound reason why he may not vote in other cases where his personal interests are directly and immediately at stake.

5. But if at common law a person could not vote upon questions in which he is personally interested, the right to do so is expressly given by our statutes. " Every male inhabitant of each town * * shall have a right at any meeting to vote in the town in which he dwells and has his home." G. L., c. 29, s. 1; c. 30, s. 5. There are no exceptions. Every such inhabitant having his name upon the check-list, has the right to vote upon all questions which may arise in the meeting. No power is given the town to establish any different rule. The moderator has no authority to reject the vote of such inhabitant when offered upon any question before the meeting, and if he does is liable to fine and imprisonment." G. L., c. 36, s. 9. The fact that there is no provision for the rejection for any cause of a vote of a legal voter when offered, is decisive that if the common law were as above supposed, the legislature intended to change and did change it.

6. Finally, assuming the law to be as claimed by Mr. Kinsley, the removal of the former agent, and the choice of a new one with authority to adjust the suits, were matters in which the defendants were not so directly and especially interested as to preclude them from voting thereon. Assuming that they could not vote upon the terms of a settlement had the question been thereon, it does not follow that they may not vote upon preliminary and incidental questions,—as whether the subject shall be considered at all, or be indefinitely postponed; whether the matter shall be referred to a committee or agent for consideration and adjustment, or even to an arbitrator; and upon the question who shall be such committee, agent, or arbitrator.

III. Each one of the nine defendants has no more legal interest in the result of the other eight suits than any other tax-paying citizen of the town. He has at the most a mere interest in the question, which would not, in former times, have disqualified him as a witness (1 Greenl. Evid., s. 389), or as a matter of law even to act as an arbitrator or judge. *Cheney* v. *Martin*, 127 Mass. 304; *Moses* v. *Julian*, 45 N. H. 55.

His right to vote upon the several questions, so far as they relate to all the suits except his own, is not therefore upon any view open to doubt; and he cannot be deprived of that right by joining without his consent in one question, with the matters upon which he is entitled to vote, another matter upon which he cannot vote. To hold otherwise, however much or little wrong might be done in this particular case, would establish a precedent dangerous in its future consequences. A case may easily be supposed in which it would enable a minority practically to disfranchise the majority. If the questions here had been put distributively, respecting one case at a time, that the other six defendants (of the seven who voted) could properly vote thereon is undeniable, and the result would have been the same as now, except that the majority would have been one less in each instance.

IV. Two of the nine defendants were not, as the case finds, present at the meeting, and did not vote. There is no ground to claim, therefore, that the action of the town, so far as the suits against them are concerned, was not in all respects legal and valid. Their motion therefore must at all events prevail, and the actions against them be entered neither party.

V. The fact that more or less business was transacted in the meeting after the removal of the former and the choice of the new agent, and before the resolution authorizing the agent to settle the suits was adopted, is immaterial.

1. Parliamentary law forms no part of common law. It applies exclusively to the houses of lords and commons in England. It does not govern the action of assemblies, or bodies corporate whose power is derived by grant from the crown or created under the authority of an act of parliament. It is not conferred upon a supreme legislative assembly of a colony by the introduction of the common law into the colony. *Fenton* v. *Hampton,* 11 Moo. P. C. 347.

2. But, if in force here, town-meetings are not governed by its rules, but only by such rules as the moderator may prescribe subject to alteration by the town. G. L., *c.* 39, *s.* 3; *Hill* v. *Goodwin,* 56 N. H. 441; *Kimball* v. *Lamprey,* 19 N. H. 215;—see, also, *Hunneman* v. *Grafton,* 10 Met. 457.

The articles in the warrant need not be acted upon in their order: the moderator may at any time call for action upon any article he pleases, subject only to be controlled therein by vote of the town. Action taken may, upon the motion of any one, be reconsidered and rescinded at any time during the same meeting, or at a subsequent meeting if no rights under the same have in the meanwhile accrued *(Mitchell* v. *Brown,* 18 N. H. 315, *Davis* v. *School Dist.,* 44 N. H. 398, *Pond* v. *Negus,* 3 Mass. 230, *Withington* v. *Harvard,* 8 Cush. 66, *Stoddard* v. *Gilman,* 22 Vt. 568, and 1 Dill. Mun. Cor., *s.* 228 and notes), and that, too, even after a formal resolution not to reconsider has been adopted. *Hunneman* v. *Grafton, supra.*

The vote of the town upon any subject may be taken in such manner as the moderator sees fit, where the method is not prescribed by statute or directed by the town. *Kimball* v. *Lamprey,* 19 N. H. 216.

It is no objection to the action of the town that it was had near the close of the meeting, and when a portion of the voters had retired. *Bean* v. *Jay,* 23 Me. 117. And this is evident also from the fact that a reconsideration of any measure adopted may be had at any time before the meeting closes.

VI. The gist of the question now before the court is, whether the town shall be compelled, against its will, to fight nine lawsuits for the benefit mainly, in any event, of the lawyers therein engaged; whether it shall be compelled, in spite of its protest, to investi-

gate and prosecute, at great expense, claims of such a character that if it prevails it will recover hardly enough to pay the bills, and if defeated will be saddled with enormous costs. Why should not a town be permitted under such circumstances to act as a prudent man would do, and agree with its adversary?

The minority cannot thereby be in any wise injured: the rights of Mr. Kinsley and his friends will not be affected. If they have confidence enough in the validity of these claims against the defendants to invest their own funds in the prosecution thereof; if they are willing to make their faith manifest in works as well as talk,—there is nothing in the way of their so doing. *Gates* v. *Hancock*, 45 N. H. 528; *Denniston* v. *School District*, 17 N. H. 492; *Barr* v. *Deniston*, 19 N. H. 170.

The especial attention of the court is invited to the bill in equity filed by Kinsley as a tax-payer, and now pending against the defendants. It is manifest that all the rights of the minority can be as fully protected and enforced in that proceeding as by these suits at law. *Downing* v. *Company*, 40 N. H. 230; *Gove* v. *Epping*, 41 N. H. 545; *Merrill* v. *Plainfield*, 45 N. H. 126; *Winsor* v. *Bailey*, 55 N. H. 218, and cases before cited.

The only difference (except in so far as the bills of counsel on the one side and the other may be affected) is, that in the former case the expense of the prosecution, and, if defeated, the defendants' costs, must be paid by Kinsley & Co. out of their own pockets, while in the latter the whole burden rests upon the town. Herein is the only substantial point of the present controversy, the very pith and marrow of the whole question now before the court.

STANLEY, J. The question here is, whether those against whom the plaintiffs have brought suits had a legal right to vote on Article 7 in the warrant for the annual town-meeting, Nov. 2, 1880. That article was, "to hear the agent's report as to town suits, now pending, and the items of expense incurred therein, and to take such action as to said suits as may be thought best."

Under this article the town "voted to remove the town agent." Norris was then elected, and qualified as agent by taking the oath of office, and, after other business had intervened, a vote was passed empowering "Norris to settle all legal claims and demands against the defendants in suits now pending before William S. Ladd, auditor."

All these votes except the last were carried by the votes of those against whom the suits were pending, and would not have been carried without them. Their names were on the check-list, and they were entitled to vote unless their interest in the subject-matter of the article and the votes under it disqualified them.

The theory of our political system is, that the ultimate sovereignty is in the people, from whom springs all legitimate authority. As a practical fact, the sovereignty is vested in those persons who

are permitted by the constitution of the state to exercise the elective franchise.

Each state establishes its own regulations in regard to voting and the qualifications of voters, subject to the constitution of the United States; and when the qualifications of electors are prescribed in the constitution, they can be changed only by an amendment of the constitution.

Under our constitution and laws, every male inhabitant, of the age of twenty-one years and upwards, who has resided in any town six months next preceding the election at which he claims the right to vote, except paupers, persons excused from paying taxes at their own request, and unnaturalized aliens, is entitled to have his name upon the check-list, and to vote on all matters which may come before the meeting for action. The authority of the supervisors in making the list goes no further than an inquiry into these facts. They cannot inquire into the personal or pecuniary interest of the applicant in matters to be acted on. Bill of Rights, art. 12; Const., arts. 13, 27, 28, 30; G. L., *c.* 29, *ss.* 1, 2, 8, 9—*c.* 30, *ss.* 1, 5. If the defendant could not vote on the seventh article of the warrant, his name could not, for that reason, be excluded from the check-list; and his name being on the check-list, the moderator had no authority to reject his vote.

When the name of the voter is entered upon the list, his right to vote is not confined to electing and being elected to office. It extends to all matters that may come before the meeting. It confers the same right to vote on questions pertaining to the prudential affairs of the town, as on any other question. G. L., *c.* 37, *s.* 4. Towns may make rules and by-laws for managing and ordering their prudential affairs (G. L., *c.* 37, *s.* 5) ; but this statute confers no authority to define the qualifications of voters. The moderator may prescribe rules of proceeding which may be altered by the town (G. L. *c.* 39, *s.* 3), but this gives him no authority to reject the vote of any person whose name is upon the list. His authority goes no further than the preservation of order and the proper conduct of the business of the meeting. He may examine the ballot so far as to see that only one vote is offered, but this is all. If the voter votes illegally, the statute affixes the penalty.

If it is admitted that interest is a disqualification, how is it to be determined? Not by the supervisors, whose duties are defined by statute, and among which the question of interest is not included; besides, the voter would have the right to vote on all questions in which he had no pecuniary interest. It could not be done in open town-meeting. The consequences of such a course are too serious to warrant the trial. The question must necessarily be settled before the vote is taken, for otherwise the whole action of the town might be void. To settle it in the meeting would require the suspension of all other business, and an investigation

and decision of the question. The denial by the voter of his interest would not be conclusive. Either party would have the right to produce evidence and examine witnesses, and to argue the question. A difficult question might arise as to the amount and kind of interest that should disqualify, and who should be allowed to vote on the question of the right of the voter whose right is denied. Where is the line to be drawn? This case illustrates the difficulty of an inquiry into the question. The seventy-six who voted against the removal of the town agent had as direct an interest in that question as any of the eighty-four who voted for the removal. It might not have been as great in amount, but it was as direct, and the same in kind. If the minority had succeeded and the suits been prosecuted to judgment, there might have been a recovery by the town, and the liabilities of the town reduced thereby, thus reducing their taxes. Kinsley had the additional interest to retain the office of agent, for that afforded him an opportunity to render service and obtain compensation therefor.

If interest disqualifies a person from voting in towns on questions affecting his interests, it must have the same effect in school-district and precinct meetings. Many questions might arise in such meetings directly affecting the property and property rights of the voters. When such questions do arise, all other business must be suspended, and the meeting resolve itself into a court to decide the qualifications of the voters. The result would be, that town, district, and precinct meetings, instead of being engaged in the orderly transaction of business, would be occupied with interminable wrangles over the right to vote, engendering discord, strife, and bitterness, and ending in confusion. It would be next to impossible to transact the necessary business. No question relating to prudential affairs could arise in which some if not all the voters would not have such a direct pecuniary interest, in kind if not in amount, as that of this defendant in the question on which he voted.

The authorities, cited to the effect that no person can be a judge in his own cause, do not apply to this class of cases. They go too far. Such a rule, applied to voting in town affairs, would exclude every person from acting. Money could not be raised for schools or highways, or for any purpose for which towns are authorized to raise and expend money. No public works could ever be carried forward. The consequences of such a doctrine show its unsoundness.

The practice and rules of representative legislative bodies are urged as an argument against the defendant's right to vote, but there is no occasion to consider them. The law of this case is clear upon precedent and principle. It is settled by usage since the adoption of the constitution, and by more than a hundred years of town-meeting practice prior to the adoption of the constitution. It is an elementary principle of our local self-government. A reason for submitting a local question to the voters in

town-meeting is, that by their interest in it they are peculiarly qualified to decide it.   And, in many cases, the more direct and exclusive their interest, the more reason there is supposed to be for delegating to them the power of legislation.   The power of taxation for local purposes is to a certain extent committed to them, because, of all men legally capable of exercising it, they have or are presumed to have the greatest personal concern in its exercise as payers of town taxes, and as persons benefited by their expenditure.   A tax-payer, voting for or against a proposition to raise money for the public use of his neighbors and himself by a tax assessed upon them and him, votes upon a question of his own interest; and he can vote in the negative on the ground that the tax will take money out of his pocket, or in the affirmative on the ground that the use to which the tax is to be applied will increase his estate.   And voters may be governed by similar motives in their decision of other questions of municipal monetary affairs, including the question of prosecuting such suits as this. The defendant's tax-paying neighbors are, in a certain practical sense, parties in interest in this suit.   Those whose names are on the check-list can vote to carry on the suit or to drop it, according to their view of their own advantage or disadvantage.   Legislative power on the subject is delegated to the voters of Dorchester because of their interest in it.   And when the defendant's neighbors are allowed to vote on the question on account of their interest, he is not forbidden to vote on account of his interest.   The contrary doctrine would allow them to vote for a tax on the ground that it would make them richer, and forbid his voting against it on the ground that it would make him poorer.   The defendant's motion should be granted.

*Case discharged.*

SMITH, J., did not sit: the others concurred.